Filed 8/17/21  P. v. Rodas CA4/1
Received for posting on 8/19/21

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>OSCAR RODAS,<br><br>    Defendant and Appellant. | D077523<br><br><br>(Super. Ct. No. SCN392777) |


APPEAL from a judgment of the Superior Court of San Diego County, Harry M. Elias, Judge.  Affirmed.

Mary Woodward Wells, under appointment by the Court of Appeal, for Defendant and Appellant.

Matthew Rodriquez, Acting Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Steve Oetting and Paige B. Hazard, Deputy Attorneys General, for Plaintiff and Respondent.

After his girlfriend broke up with him, Oscar Rodas sent her multiple text messages threatening to kill her.  When she went out with a friend on Halloween instead of spending the evening with him, his threats intensified.

Rodas spent the evening looking for her and continued to send threatening messages. When he finally saw her, he chased her into a convenience store to confront her, but then left. She followed him outside, told him she did not want him back or did not love him, and he shot her twice, delivering a second lethal blow after she had already fallen to the ground. Rather than rendering aid, he calmly walked away.

Rodas contends there is insufficient evidence to support his conviction for first degree murder because there is no evidence the shooting was deliberate and premeditated. We conclude the evidence amply supports Rodas's conviction for first degree murder and affirm the conviction.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *Charges*

In August 2019, an information charged Rodas with the murder of Yesenia Becerril (Pen. Code, § 187, subd. (a)) and alleged that in the commission of the crime, he intentionally and personally discharged a firearm and proximately caused great bodily injury and death (§ 12022.53, subd. (d)).[1]

### B. *Trial*

#### 1. *Prosecution's Case*

Becerril met Rodas, a former Varrio Fallbrook Locos gang member, in 2012 when she was 13 years old and he was 20. They met on Vine Street, which Rodas described as a hangout for members of his gang. They had a romantic relationship that Rodas described as "up-and-down." The evidence established he was violent in their relationship.

_____

[1] Statutory citations are to the Penal Code. The information further alleged that Rodas had various prior denials of probation (§ 1203, subd. (e)(4)) and one prison prior (§§ 667.5, subd. (b), 668).

2

In July 2014, Rodas broke Becerril's bedroom window.

In 2015, Becerril's mother arrived in response to Becerril's call requesting she "come pick her up really fast" and found Becerril hiding between parked cars. When Becerril ran to her mother's truck, Rodas suddenly appeared. Before Becerril was able to close the door, he grabbed her and tried to pull her out, but her mother pulled her in and was able to escape.

In July 2016, Rodas broke Becerril's nose.

In her journal, Becerril wrote, " 'all he does is hit me and put me down.' " Rodas told Becerril it was her fault when he hit her and she deserved it. Her journal reflected multiple incidents in which Rodas struck, beat, and kicked her: one day he " 'slapped [her] hard.' " In another incident he hit her repeatedly while his friends told him to stop. In a separate incident, she saw him coming and defensively threw herself to the ground; he kicked her repeatedly.

In September 2018, after she overheard Rodas on the phone with another woman, Becerril attempted to end the relationship. Rodas threatened to kill her if she did. On September 27, she texted him, " 'I'm not dating you.' " He responded, " 'Yes, we are. Stop f'ing saying that.' " Becerril replied, " 'Seriously, I'm not going to let you fuck me over. I put up with you hitting me and a lot of shit, but never betrayal. [¶] . . . [¶] If you really want to still be with me, we're taking it slow. But we can't just go back to normal.' " Rodas responded, " 'Fuck no. I know you're f'ing talking to a guy, and I'm going to find out and f'ing kill you.' " Later that evening he texted, " 'I'm fucking killing you, bitch. I swear I am.' " He texted, " 'I'm run up on you [*sic*], and it's when you [least] expect it.' " Becerril threatened to block him, and Rodas replied that he would " 'burn [her] house down tonight' " if

she did.  Later he texted, " 'I'm f'ing kill you.' "  (*Sic*.)  She texted " 'Don't hit me up anymore.  Well, if something ever does happen to me, I told my mom everything you said and that you were going to kill me or torture me and leave, lol [laugh out loud].' "

On September 30, Rodas threatened to kill himself if Becerril would not get back together with him.  He accused Becerril of dating other men and pleaded with her to get back together.

On October 1, he texted, " 'All I want to hear is you saying you're my love and only mine, please.' "  Later, he texted, " 'IDC [I don't care] what you say or think, but you're going to be mine again.  I'll kill any guy that dares steal you from me (smiley face).  Or sadly, I'll execute any guy you talk to. You're mine, and I take care of what's min[e], yes, I'm a jealous [boyfriend].' "

On October 3, he texted, " '[S]top shining me off before I lose my mind. Every day is just a day closer to really hurting everyone.  Just stop, dude. I'm trying not to, but you're gonna make build a lot of anger and lose it.' " (*Sic*.)

On October 5, Becerril texted, " 'I'm not getting back with you.' "  On October 6, she texted, " 'Look Imma [*sic*] be with someone that loves me, Oscar.  I can't have a life [with someone] that's gonna freak out over a friend request or that hits me whenever the fuck they feel like it.  I especially cannot have kids with you, because I don't want them to be the reason I still have to see you.' "  Rodas texted, " 'You're never going to leave me.' "

On October 11, Becerril texted Rodas, " 'Imma [*sic*] chill with you, but you got to know we ain't together.  Okay.  I just want you to understand that.' "  On October 16, Rodas texted, " 'Can I be with you on Halloween?  Ha. We can scare kids and give them candy, or let's go trick or treating.' "  She responded, " 'We can take little kids' candy, and you can shave the words "ice"

4

in the back of your head LOL [laugh out loud], JK [just kidding].' " Then she changed the subject: " 'These earphones are pretty good.' "

Becerril made plans to spend Halloween night with her friend Keyla. On October 31, when Rodas found out, he asked Becerril to cancel her plans with Keyla and " 'kick it with [him].' " He threatened he would kill her if she did not comply with his requests. At 4:37 p.m., he texted, " 'I'm f'ing get faded too and hunt you down if you drink with her. I don't trust that bitch. You told her I bet you left me, and you're talking about guys.' " (*Sic*.) At 4:41 p.m., he texted, " 'You better [not] f'ing go with her. . . . If you go with her, I'm come up and hunt you down, dude. I'm getting tired of this f'ing jealous feeling. I've been even thinking about murdering you. So please just f'ing stop, dude. Please. I'll hate to do something I'm regret later on.' " (*Sic*.) He texted, " 'I'm tired of feeling like this. . . . Please every f'ing day, I have this sad hate feeling, dude, so f'ing stop. I swear, if you go with her, I'm do something. I hate the f'ing idea of you drinking with her. So please don't f'ing go. Just tell her you can't.' " (*Sic*.)

At 4:55 p.m., he texted, " 'I can't handle this shit anymore. This is the reason why I bought that thang [*sic*, referencing his gun]. I can't control my anger, dude, and I really need it to help me. All this because of you, dude. Just please stop. . . . You're f'ing getting ready to go out with a tweaker hood rat than me? (*Sic*.) That just fills up my meter, dude. I'm tired of feeling like this.' "[2]

At 5:04 p.m., he texted, " 'Every f'ing day, it's always running through my head you doing or talking to someone. There is more to it. I can't handle it. That's the truth. If I have to murder you, I'll shoot myself after. I swear

---

[2]    Rodas admitted on cross-examination that he was referencing his gun when he texted, "[t]his is the reason why I bought that thang."

dude. I can't handle that jealousy feeling, and then the things you say and do get me even more pissed. . . . Please just f'ing stop your f'ing games, please. You're not going to f'ing go with her.'" Becerril responded, "'I'm not fucking playing games.'"

Rodas continued to insist that Becerril hang out with him instead of Keyla. Around 5:30 p.m., he texted, "'You're gonna make me do shit you're gonna regret. I'm tell you stop your f'ing f games. (*Sic.*) You're not going to f'ing kick it with her. I'm telling you now. Take my word for it, Yesenia.'" Becerril responded, "'Just stop.'" He demanded she pick up the phone, begged her to call him, and told her he was "'on Vine'" "'walking around looking for [her].'" She texted that she was at home, and he responded, "'No, you're not. . . . You were sitting in the truck, then walked away. You're not home. Where are you?'"

Around 7:00 or 8:00 that night, Keyla went to Becerril's house to get ready. Keyla's friends Ramon and Angel picked them up shortly thereafter. The group listened to music and drank beers.

At 7:18 that night, Rodas messaged a friend asking, "'How do you get over a relationship, bro? I feel like killing my [girlfriend].'" His friend responded, "'Don't follow her. Don't look for her. Don't humiliate yourself.'"

Surveillance video showed that Rodas drove through the cul-de-sac outside Becerril's home in his family's blue truck three times that night. On two occasions, he was seen parking and walking toward Becerril's house at the end of the cul-de-sac.

At 10:47 p.m., Rodas texted Becerril, "'I'm walking up and down Fallbrook. Where the f are you? Hello. F'ing text back. Text back. Text back. Text back. WTF. You said we were going to be on the phone at least. IDC that you're out, but how do I know you're not out with guys. When are

6

you going home?  Text back.  I'm on Vine Street with my strap [firearm].  Thanks for ruining my life.  Just please text me, Yesenia.  Please.  WYD [what are you doing].' "

Becerril texted, " 'What,' " and, " 'I don't ever want you back.' "

Rodas asked, " 'Why do you want.  Tell me.' "  (*Sic*.)

Becerril replied, " 'I don't want anyone.  I need myself.' "

Rodas texted, " 'Where are you.  I saw you leave.  Why you still denying it?  Call me.  Text me back ASAP.  WYD.' "  It was the last text on her phone.

At about 12:30 a.m. on November 1, Becerril and her friends ran out of beer and Angel dropped them off on Vine Street.  According to Ramon, the girls still wanted to drink so they went to a store to get more beer.  They were walking back toward Vine when Ramon saw Becerril and Keyla suddenly run into a nearby convenience store.  Ramon saw they were being chased by Rodas.

Inside the convenience store, Rodas angrily confronted Becerril and Keyla, calling Keyla a "hood rat" and a "ho."

Rodas then confronted Ramon, who was waiting outside, and demanded to know where they had been that night.  Ramon told him they were right there on Vine Street, and Rodas responded, " 'No, you weren't.  I passed by here so many times, and I didn't see you guys.' "  Rodas told Ramon to "get up," which Ramon understood to mean that he wanted him to walk up to Vine Street to fight.  Ramon did not want to fight but followed Rodas up the embankment to Vine Street.  Ramon repeated that they had been "right here on Vine" and showed Rodas the beer they had just bought.  Ramon testified that Rodas was wearing a black hooded sweater and black pants; he had his hood on.  His hands were positioned "like if he was holding his pants or his waist or his shirt or sweater or something."

7

Meanwhile, Becerril decided to confront Rodas for disparaging Keyla. Becerril and Keyla followed Ramon and Rodas up the embankment toward the street. When Ramon saw Rodas look toward the women, he took the opportunity to leave.

According to Keyla, Becerril told Rodas she did not love him, and Rodas was "just like, 'Oh fuck, what the fuck we talking about?' And he just shot her." Keyla said it was a complete surprise to her; the shots came without any warning. She said he fired two shots: "The first shot just landed her to the ground" and then he fired again. Keyla started to run, now afraid for her own life.

Keyla ran back to the convenience store. According to the store clerk, she was hysterical and said her friend had been shot. The clerk brought her inside, locked the door, and called 911. Police and medics responded shortly after 12:48 a.m. and found Becerril lying on her back with blood streaming from her head and ears and pooling around her head. Two .45-caliber shell casings were near her body. She had no pulse and was nonresponsive; a bystander performed CPR. Medics transported her to the hospital, where she was pronounced dead upon arrival.

A sheriff's deputy interviewed Keyla at the scene; the interview was captured on the officer's body-worn camera, and the footage was shown to the jury. She identified Becerril's ex-boyfriend "Oscar" as the shooter and described him as having an "FL" tattoo on his neck. Deputies interviewed Keyla a second time at the sheriff's station. She was still emotional, shaking, and drunk, but she had calmed down somewhat. She stated that Rodas had called her a "hood rat," and Becerril told her, " 'I'm going up there to talk shit to Oscar,' " and Rodas shot Becerril twice, without moving between the shots. Keyla reported that Rodas had a look of " 'surprise[]' " or " 'shock' " on his face

8

after either the first or second shot and after firing the second shot he walked away from the scene " 'calmly.' "

An autopsy revealed Becerril had two perforating gunshot wounds.[3] The first shot entered the left side of her neck and exited the back of her neck. This shot passed through soft tissue and muscle but did not hit any vital organs. A second shot entered the right side of Becerril's neck, perforated her brain and exited the top of her head. This shot would have been lethal on its own. Stippling around both the wounds indicated the gun was fired from intermediate range, or within "inches to feet" from Becerril's skin, and the evidence indicated that the shot which perforated Becerril's neck was fired from closer range than the lethal shot which perforated her brain.

Police were unable to apprehend Rodas until approximately 4:00 p.m. on November 2, when he was spotted hiding near his former place of employment.

### 2. *Defense Witnesses*

Rodas's older brother testified Rodas had been laid off from his job during the summer of 2018, and he spent a lot of time in his bedroom playing video games or at the gym. The brother had never seen Rodas with a gun. Rodas did not own a car and relied on his brothers for rides or walked. A family member owned a blue truck.

Rodas's younger brother testified that, around 11:30 p.m., his mother requested he call Rodas to tell him to bring home the blue truck. Rodas texted back, saying, " 'I don't want any bitching, okay, because I'll shoot you

---

[3] The medical examiner testified that a "perforating" gunshot wound means the bullet "went in" and "came out." In contrast, a "penetrating" gunshot wound is one where the bullet "goes in but does not come out."

or anyone if you guys get on my nerves' " and " 'Just leave me the fuck alone.' " The brother did not think Rodas would shoot him. Rodas also texted, " 'Drop me off when I get there back where I was.' "

Rodas arrived home after midnight, parked the truck, and approached his brother, who was sitting in his own car. Rodas asked his brother to take him back to the gas station near Vine Street and got in the car with his brother. He seemed drunk and upset about something. They drove to one gas station, which was no longer selling beer, so they headed toward a second, nearby gas station. On the way, they saw Becerril and two others crossing the street in their direction. Rodas got out of the vehicle. His brother thought Rodas was going to fight, or cause drama or a scene, and he just drove home. The brother testified he did not know Rodas to carry a gun and had never seen him with one but Rodas would not have told him he had bought a gun.

A personal trainer from a local gym testified he knew Rodas from the gym and encouraged Rodas to become a certified personal trainer. Rodas admitted he had been involved in a gang but wanted to "make changes and wanted to improve." He was in the process of getting a chest tattoo removed and said he wanted to remove all his tattoos. Rodas was proud when he earned his personal trainer's certificate.

An expert on criminal street gangs testified that members of Latino gangs face "extreme consequences," even death, if they stop hanging out with their gang, but they may be allowed to leave without negative consequences if they become religious and "give [their] life over to Christ" or if they have a child and dedicate their life to family. A gang member with a visible tattoo is "flagging [their] gang," and if they are not seen "putting in work" for the gang, it is a sign of disrespect. Latino gangs disapprove of killing women or

10

children.  Certain nights, including Halloween, have higher than usual gang activity.  People who live in neighborhoods where gangs are prevalent are often uncooperative with law enforcement for fear of retaliation.

Rodas testified in his own defense.  He admitted he had been a member of the Fallbrook Locos gang, and explained that the large "FL" tattoo on his neck stood for "Fallbrook Locos."  He stopped hanging out with his gang in 2017 because he wanted to change his lifestyle; he started going to the gym and improving his diet.  He thought his safety was in danger because he had left the gang without their permission.

He met Becerril in 2012, and they had a romantic relationship, but it was "rocky."  He testified he and Becerril often broke up and got back together.  She broke up with him on September 27, 2018, when she overheard him talking to another girl.  He begged for her forgiveness and thought they would get back together again.  They discussed possibly hanging out together on Halloween.  Rodas was upset when he learned that Becerril was going out with Keyla on Halloween night; he testified he "[knew] about" Keyla from his "old friends" and claimed "she was known as illiterate."

Rodas admitted he went looking for Becerril.  He drank beers and took his brother's truck to try to find her.  His plan was to convince her to hang out with him that night.  He sent threatening texts because he was "mad" and "drunk" but claimed he was still in love with her and did not plan to kill her.  He testified he did not bring his gun when he went looking for her.

When he got a message from his brother requesting he bring the truck home, he went home and got in his brother's car.  He asked his brother to drive him to the gas station for more beer because he wanted to keep drinking.  He brought his gun, which he claimed was behind the tire under one of the family's parked cars, because he planned to confront gang

11

members on Vine Street over rumors he heard that "they were supposedly going to shoot [him] because [he] wasn't active anymore." He was "pumped up, mad, [and] drunk."

When he saw Becerril, Keyla, and Ramon, he jumped out of the car and followed the women into the gas station. He did not remember the entire conversation, but he recalled "being rude to Keyla." He asked Becerril if she would drink with him, and she either said no or did not respond. Then he walked out of the gas station and confronted Ramon, asking him "if he was with Yesenia and where were they at." He did not remember exactly what happened but remembered he and Ramon went up the embankment to Vine Street. He did not expect Becerril to follow them, and he did not notice she was there until she was "right next to [him] almost." Becerril confronted him "about why was [he] talking shit to Keyla." He told Becerril he "didn't want her hanging out with [Keyla] because she was an illiterate." Becerril said "something like 'Fuck you, I'm not with you. It's over,'" which shocked him, and he did not remember reacting other than running. He did not plan on killing her. When asked how he felt when he realized he had killed Becerril, he responded "I guess, well, bad."

On cross-examination, Rodas admitted that his text messages reflected his jealousy and anger. He testified that he did not have his gun with him when looking for Becerril, even though he texted Becerril around 11:00 p.m. that he was "on Vine Street with [his] strap." He claimed he "never had the gun . . . until [he] went to buy the beer." He admitted "she said something to make [him] pull out a gun and shoot her," but he could not recall what the words were because "it just happened fast." He could not "really recall" whether he aimed for her neck when he shot her the first time and he did not remember shooting her a second time when she was lying on the ground.

12

### 3. *Closing Arguments*

The prosecutor argued that Rodas's motive to kill Becerril was his jealousy and his desire to control her. He killed her with a gun, shooting not once but twice, in the neck and then through her brain, and then, rather than administering aid, he fled the scene and hid.

Rodas's counsel argued that Rodas was upset, angry, depressed, and drunk on Halloween, but he did not plan to kill "the love of his life." His threatening texts did not reflect actual plans, as evidenced by the fact that he sent his brother a threatening message. He acted rashly and under intense emotion, in the heat of passion. Rodas was carrying a gun because he was ready to confront his former gang members, not because he intended to kill Becerril. He did not kill her when he first confronted her in the convenience store, and only killed her when she confronted him near Vine Street.

### 4. *Jury Instructions*

The jury was instructed that, to prove the defendant is guilty of murder, the prosecution is required to prove that the defendant committed an act that caused the death of another person and when the defendant acted, he acted with malice aforethought. (§ 187, CALCRIM No. 520.)

The jury was further instructed regarding first degree murder (§ 189) as follows:

> "The defendant is guilty of first degree murder if the People have proved that he acted willfully, deliberately, and with premeditation. The defendant acted *willfully* if he intended to kill. The defendant acted *deliberately* if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill. The defendant acted with *premeditation* if he decided to kill before completing the act that caused death.
>
> "The length of time the person spends considering whether to kill does not alone determine whether the killing is

13

deliberate and premeditated. The amount of time required for deliberation and premeditation may vary from person to person and according to the circumstances. A decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated. On the other hand, a cold, calculated decision to kill can be reached quickly. The test is the extent of the reflection, not the length of time.

"The People have the burden of proving beyond a reasonable doubt that the killing was first degree murder rather than a lesser crime. If the People have not met this burden, you must find the defendant not guilty of first degree murder and the murder is second degree murder." (CALCRIM No. 521.)

### 5. *Verdict*

The jury found Rodas guilty of first degree murder (§§ 187, subd. (a), 189, subd. (a)). The jury further found that Rodas intentionally and personally discharged a firearm and proximately caused great bodily injury and death to a person (§ 12022.53, subd. (d)). The trial court declined to exercise its discretion to strike the firearm enhancement and sentenced Rodas to a total term of 50 years to life in prison, comprised of 25 years to life for first degree murder and a consecutive 25 years to life for the firearm enhancement.

## DISCUSSION

" 'On appeal we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Cravens* (2012) 53 Cal.4th 500, 507 (*Cravens*).) We "presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. [Citation.] 'Conflicts and even

14

testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.  [Citation.]  We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence.' " (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)  "As a reviewing court we do not ask whether we believe the evidence proves guilt beyond a reasonable doubt, but whether any reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt." (*People v. Martinez* (1987) 193 Cal.App.3d 364, 369 (*Martinez*).)  Reversal for insufficient evidence is not warranted unless it appears " 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' " (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)  " 'Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence.' " (*People v. Brooks* (2017) 3 Cal.5th 1, 57.)

"Murder is the unlawful killing of a human being . . . with malice aforethought."  (§ 187, subd. (a).)  "All murder that is perpetrated by . . . willful, deliberate, and premeditated killing . . . is murder of the first degree."  (§ 189, subd. (a).)  A reviewing court typically will sustain a first degree murder conviction when three types of evidence are present:  "(1) facts about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing—what may be characterized as 'planning' activity; (2) facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of 'a pre-existing

reflection' and 'careful thought and weighing of considerations' rather than 'mere unconsidered or rash impulse hastily executed' [citation]; (3) facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way for a 'reason' which the jury can reasonably infer from facts of type (1) or (2)." (*People v. Anderson* (1968) 70 Cal.2d 15, 26-27 (*Anderson*).) Evidence of these three factors "need not be present in any particular combination" to establish premeditation and deliberation. (*People v. Burney* (2009) 47 Cal.4th 203, 235 (*Burney*).)

Rodas claims there is insufficient evidence to show he acted pursuant to a preconceived plan, the manner of killing did not evince a calculated and deliberate design to kill, and his behavior after the killing supports the conclusion he did not premeditate the murder. We disagree. There is ample evidence establishing Rodas had the motive to kill, engaged in planning activity prior to the killing, and killed in a manner demonstrating premeditation and deliberation.

Rodas's intensifying jealousy and desire to control Becerril provide solid evidence of his motive. Beginning in late September 2018, when Becerril ended their relationship, Rodas repeatedly threatened to kill her if she talked to other men or refused to get back together with him: " 'I know you're f'ing talking to a guy, and I'm going to find out and f'ing kill you' "; " 'I'm fucking killing you, bitch. I swear I am' "; " 'I'm run up on you [*sic*], and it's when you [least] expect it.' " When Becerril threatened to block him, Rodas threatened to " 'burn [her] house down' " and texted, " 'I'm f'ing kill you.' " (*Sic*.) Over the course of the next month, he threatened to kill himself, begged her not to date other men, and repeatedly pleaded with her to get back together with

16

him. He warned her, " 'You're never going to leave me.' " When he found out Becerril was planning to spend Halloween with a friend instead of with him, his threats intensified. That evening, he texted he would " 'hunt [Becerril] down if [she] [drank] with [her friend].' " He warned he was " 'even thinking about murdering [her].' " " 'I swear, if you go with her, I'm do something.' " (*Sic*.) " 'This is the reason why I bought that thang [*sic*, referencing his gun].' " " 'If I have to murder you, I'll shoot myself after.' " When she refused his demands to change her plans, he texted, " 'You're gonna make me do shit you're gonna regret.' " Rodas admitted his messages reflected his jealousy and anger. In addition, they demonstrated Rodas's intense desire to control Becerril and his determination to kill her if she did not comply with his demands. (See *People v. Felix* (2009) 172 Cal.App.4th 1618, 1627 (*Felix*) ["The jury was entitled to give significant weight" to defendant's threats to kill the victim "so close in time to the shooting"].) Rodas's violent relationship with Becerril is further evidence of motive. Rodas repeatedly abused Becerril during their relationship. The jury could reasonably infer that, after they broke up, he became so enraged he decided to escalate the situation and kill her when he could no longer continue to control her. (See *People v. Cruz* (1980) 26 Cal.3d 233, 245 ["Defendant's pent-up resentment toward his victims establishes the prior relationship from which the jury reasonably could infer a motive for the killings."]; see also *People v. Jackson* (1989) 49 Cal.3d 1170, 1200 [" '[T]he law does not require that a first degree murderer have a "rational" motive for killing. Anger at the way the victim talked to him . . . may be sufficient.' "].)

Rodas's text messages also provide considerable evidence of his planning activity. (*Martinez, supra*, 193 Cal.App.3d at p. 371 [repeated threats to kill victim if defendant caught her with another man constituted

17

evidence of planning activity despite defense claim of intoxicated rage].)

Rodas admitted he was looking for Becerril. He texted that he was " 'on Vine' " " 'walking around looking for [her],' " that he was " 'walking up and down Fallbrook,' " and he was " 'on Vine Street with [his] strap [firearm].' " In addition, he messaged a friend, " 'I feel like killing my [girlfriend].' " He drove past her house multiple times trying to find her. Rodas told Ramon he did not believe that the group had been hanging out on Vine Street, claiming he had " 'passed by [there] so many times, and [he] didn't see [them].' " Although he claimed he was not armed when he was searching for Becerril, the jury was not required to accept his testimony as true, especially considering his contrary message telling Becerril he was " 'on Vine Street with [his] strap.' " (See *People v. Adcox* (1988) 47 Cal.3d 207, 240 [defendant taking gun to scene of crime and killing unarmed victim reasonably suggests defendant at least considered the possibility of murder in advance]; *Felix*, *supra*, 172 Cal.App.4th at p. 1627 [jury could infer planning based on defendant arming himself with a firearm before driving to victim's location].)

From this evidence, the jury could infer that Rodas searched for Becerril, armed with his firearm, for hours before completing his plan to kill her. Together with the evidence that Rodas threatened to kill Becerril if she went out with Keyla or other men, the evidence supports the inference that Rodas, having formed the intent to kill Becerril if she spent the evening with her friends instead of him, "killed her in conformity with that preconceived plan." (*Martinez, supra*, 193 Cal.App.3d at p. 371.) Thus, "[t]here was sufficient evidence of motive and planning to sustain the conviction for first degree murder. The circumstantial evidence here provides a reasonable foundation for an inference of premeditation and deliberation, and is not merely conjecture and surmise." (*Id.* at p. 370.)

The manner of the killing provides further evidence of premeditation and deliberation. Rodas fired two shots at close range, striking Becerril in the neck. (See *People v. Halvorsen* (2007) 42 Cal.4th 379, 422 [shooting victim in the neck from a few feet away was a "method of killing sufficiently ' "particular and exacting" ' to permit an inference that defendant was 'acting according to a preconceived design' "].) Even after the first shot "landed her to the ground," Rodas fired at Becerril again. The shot that caused Becerril to fall perforated her neck; the second shot delivered a lethal blow which perforated her brain. "[F]iring a shot at a vital area of the body at close range," as in this case, is a manner of killing which "support[s] a verdict of premeditated and deliberate first degree murder." (*People v. Koontz* (2002) 27 Cal.4th 1041, 1082.)

Rodas contends his case is similar to *People v. Boatman* (2013) 221 Cal.App.4th 1253. In that case, the defendant claimed he pointed a gun at his girlfriend and cocked the hammer back as a joke, accidentally shooting her in the face. (*Id.* at pp. 1259-1260, 1263.) The appellate court concluded there was insufficient evidence of premeditation and deliberation to support first degree murder based on the lack of evidence of planning and "weak" evidence of motive. (*Id.* at pp. 1267-1271.) By contrast, here, there was overwhelming evidence of motive and planning, which, together with the manner of killing—shooting Becerril in the neck and then delivering a second, lethal gunshot after she had already fallen to the ground— establishes "a ' "preconceived design" to take the victim's life.' " (*Id.* at p. 1268.) Moreover, in *Boatman*, the defendant killed the victim by firing only one shot, and the defendant thereafter directed his brother to call 911, rendered aid, and behaved as if "horrified and distraught about what he had done." (*Id.* at pp. 1261, 1267.) Rodas's actions in this case bear no

resemblance to *Boatman*—Rodas shot his girlfriend once, then shot her again as she was on the ground. Rather than administering aid or calling for help, Rodas calmly left the scene as Becerril was lying in a pool of her own blood. When asked at trial how he felt, all he could say was "I guess . . . bad." This evidence supports a finding of premeditation and deliberation, and does not suggest Rodas was acting rashly and impulsively. (*People v. Disa* (2016) 1 Cal.App.5th 654, 667 [jury could find defendant's calm behavior after the killing "inconsistent with a state of mind that would have produced a rash, impulsive killing"].)

Rodas further contends the manner of killing does not evince a deliberate design to kill because he did not kill Becerril during their first encounter in the convenience store. He claims this scenario only supports a conviction for second degree murder as it reflects "a spontaneous and uncontrolled emotional outburst." He further suggests he no longer planned on running into Becerril, he was only carrying a gun because he feared gang retaliation, and he shot Becerril on impulse when she confronted him. However, the jury was not required to accept Rodas's story that he killed Becerril only in a rash response to the brief statements she made outside the store. (*People v. Williams* (2018) 23 Cal.App.5th 396, 410 (*Williams*).) The jury instead could credit the evidence establishing that, when Becerril refused to comply with Rodas's demand that she not go out with friends, Rodas armed himself with his gun, went looking for her, and, when she reaffirmed she would not get back together with him, he shot her twice— fulfilling his earlier threats to kill her. (See *People v. Wells* (1988) 199 Cal.App.3d 535, 540 [planning may occur in the moments before the shooting].) This evidence supports an inference that Rodas made a deliberate decision to ensure the victim's death in accordance with his preconceived

20

plan, and not a rash impulse. The fact that Rodas temporarily digressed from his plan by questioning Ramon about their whereabouts does not undermine the evidence of premeditation and deliberation. To the contrary, his questioning of Ramon and refusal to believe Ramon's account about his involvement with Becerril is entirely consistent with Rodas's jealous, controlling, and violent actions, as well as a preconceived plan to kill Becerril for going out with others instead of him. (See *Williams*, at pp. 410-411 [finding sufficient evidence of deliberation and premeditation based in part on "evidence of motive: rage at the collapse of the marriage," and plan to talk to wife in order to "induce her to remain in the marriage or—failing that—to kill her"].)

Rodas also argues that the look of surprise Keyla described having seen on his face after he shot Becerril precludes a finding of premeditation and deliberation. There were differing accounts as to when this expression occurred—after the first or second shot. Defense counsel argued during closing that, if the look of "shock" happened after the second shot, the jury should conclude Rodas "acted rashly and under the influence of intense emotion that obscured his judgment." If the look of "shock" happened between the two shots, counsel acknowledged the jury would "have more to think about," but maintained it still showed lack of deliberation because Rodas "did not stop and think between shots." But the jury was not required to accept these inferences: "[A]ssuming a reasonable jury could have found the evidence did not support premeditation and deliberation . . . , defendants' convictions must stand because . . . '[i]f the circumstances reasonably justify the jury's findings, the reviewing court may not reverse the judgment merely because it believes that the circumstances might also support a contrary finding.' " (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 295; see also

21

*Williams, supra*, 23 Cal.App.5th at p. 410 ["The jury *could* have reasonably found that the victim's injuries reflected an emotional, berserk attack, as suggested by defendant's briefing. But it was permitted to find otherwise."].) The jury instead could conclude that Rodas still had time to deliberate between the two shots regardless of any expression he may have displayed. (*People v. Perez* (1992) 2 Cal.4th 1117, 1127 [" 'Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly.' "].) The jury also could reasonably conclude that any look of shock that he displayed *after* the two shootings did not negate his premeditation and deliberation in planning and executing her killing. "Moreover, in light of the evidence of premeditation, a jury reasonably could disbelieve defendant's statements [regarding the manner of killing] to the extent they attempted to minimize his culpability." (*Burney, supra*, 47 Cal.4th at p. 236.)

In sum, the prosecution presented ample evidence of motive, planning activity, and the manner of killing to support the jury's conclusion that Rodas committed the murder willfully, deliberately, and with premeditation. (*Anderson, supra*, 70 Cal.2d at pp. 26-27.) Reviewing the record in the light most favorable to the judgment, we conclude substantial evidence supports Rodas's conviction for first degree murder. (*Cravens, supra*, 53 Cal.4th at p. 507.)[4]

---

[4] Rodas made an additional argument in his opening brief regarding various fines and fees that were imposed, but he withdrew this argument in his reply brief and it is unnecessary for us to address it.

DISPOSITION

The judgment is affirmed.


GUERRERO, J.

WE CONCUR:


McCONNELL, P. J.


AARON, J.